**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | | |
|---|---|---|
| **LIBBY HEWES,** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **1:21-cv-00125-JDL** |
| | ) | |
| **SAMANTHA PANGBURN et al.,** | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |

**ORDER ON THE DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

Under advisement are two motions for summary judgment filed by separate groups of Defendants: (1) Healy Chiropractic, LLC, and its owner, Patrick Healy (the "Healy Defendants") (ECF No. 163); and (2) the Brewer School Department and Samantha Pangburn, a former Brewer High School administrator (the "School Defendants") (ECF No. 165). The Plaintiff, Libby Hewes, brought an eighteen-count Amended Complaint (ECF No. 4) against these Defendants, as well as other Defendants who were previously dismissed as parties to this case. Many of the original claims against the remaining Defendants have also been dismissed, leaving eleven claims against the Healy Defendants and three claims against the School Defendants for consideration at the summary judgment stage of this proceeding.[1] For

---

[1] The only other remaining Defendant, Benjamin ("Ben") Pushard, has not moved for summary judgment.

reasons I will explain, I grant the Healy Defendants' and the School Defendants' Motions for Summary Judgment.

## I.  FACTUAL BACKGROUND

The following facts are drawn from the assertions properly presented and supported in the Defendants' statements of material fact (ECF Nos. 164, 166), Hewes's opposing statements and additional statements of material fact (ECF Nos. 171, 172, and 182), and the Defendants' replies to Hewes's additional statements (ECF Nos. 178, 186). *See* Fed. R. Civ. P. 56(c); D. Me. Local R. 56. These facts are undisputed unless otherwise noted and I treat them as true solely for the purpose of deciding the pending motions. The facts also incorporate non-material information from the stipulated summary judgment record (ECF Nos. 156, 158) beyond those statements as needed to contextualize the parties' undisputed assertions.

### A.  Hewes's Involvement with Defendant Ben Pushard

The Plaintiff, Libby Hewes, was born in May 2001, attended Brewer High School from the fall of 2015 through 2019, and played on sports teams while there. Hewes and Defendant Ben Pushard met in approximately July 2014. Pushard engaged in unlawful sexual contact with Hewes, then a minor, starting in April 2015 and ending in May 2017. Pushard also sexually assaulted Hewes during that period.[2] Pushard was 20 years old when the conduct underlying those crimes began; he was 22 years old when the criminal conduct ended. Hewes alleges that she and Pushard had sexual intercourse on the premises of Brewer High School only once, during the

---

[2]  In 2023, Pushard pleaded guilty in state court to crimes including unlawful sexual contact and gross sexual assault for his involvement with Hewes.

summer of 2016, in an unlocked closet inside an unlocked equipment building located behind Coffin Field.  No sexual activity between Hewes and Pushard ever took place in any of the Healy Defendants' offices.

Hewes kept her involvement with Pushard a secret from most people; the only other person with actual knowledge of the situation beyond rumors was a friend of Hewes's, another Brewer High School student.[3]  By her own account, Hewes lied to people "countless times" about her involvement with Pushard while their physical intimacy was ongoing.  ECF No. 156-2 at 28:4.  Pushard told Hewes to lie about their involvement to protect him from going to jail.  After the unlawful contact between them ended, Hewes had no in-person contact with Pushard from May 2017 until June 2020,[4] although Pushard sent Hewes Instagram messages about his new girlfriend in the fall of 2017.

## B.   The Healy Defendants

Defendant Patrick Healy ("Healy") is a Doctor of Chiropractic Medicine and the sole owner of Defendant Healy Chiropractic, LLC ("Healy Chiropractic").  The Brewer School Department first entered a services contract with Healy Chiropractic in 2011, under which Healy became the Department's "Team Doctor."  ECF No. 164

---

[3]  Hewes denies this assertion without genuinely disputing it.  Hewes denies this statement on the basis that the School Defendants were aware of rumors of a physical "relationship" between her and Pushard.  That denial does not properly controvert the asserted fact because awareness of rumors is not tantamount to "actual knowledge."  *See, e.g.*, *Wadsworth v. Maine Sch. Admin. Dist. 40*, 663 F. Supp. 3d 83, 128 (D. Me. 2023) ("'rumors' . . . have been held not to constitute 'actual knowledge'" (quoting *Doe v. Bradshaw*, 203 F. Supp. 3d 168, 185 (D. Mass. 2016))).  *See generally* D. Me. Local R. 56(f).

[4]  Hewes denies this assertion without genuinely disputing it.  The fact that she asserts in response, that she had in-person contact with Pushard in June 2020, is consistent with the fact asserted by the Healy Defendants.

at 1, ¶ 2.  As Team Doctor, Healy attended and provided necessary services during most Brewer High School sporting events, including those involving the women's basketball and men's baseball teams.  Healy Chiropractic did not employ any athletic trainers when it first entered into a contract with the Brewer School Department, and Healy personally performed all the services of Team Doctor until 2014.

Eventually, Healy brought on help.  Jacob Cross was an intern for Healy Chiropractic during the spring of 2014 and was hired as an athletic trainer in August 2014.  After substantial on-the-job training, Cross took over many of Healy's duties for the Brewer School Department.  Cross continued working as an athletic trainer for Healy Chiropractic through 2019.

Defendant Pushard also joined Healy's practice.  While serving as Team Doctor, Healy became acquainted with Pushard's father, who coached baseball and basketball for Brewer High School.  During that time, Pushard and his younger brother attended and played sports for Brewer High School.  Later, while at college to become an athletic trainer, Pushard often returned to Brewer High School to join his father and, incidentally, Healy on the sidelines during sporting events, including to watch his brother's games.  Pushard also volunteered as an assistant coach for the Brewer High School junior varsity baseball team for the spring seasons in 2014, 2015, and 2016.  Healy became aware of Pushard's professional goal and encouraged him to pursue it because, according to Healy, qualified trainers were in short supply.

Hewes and the Healy Defendants agree that Pushard job-shadowed Healy and Cross in the spring of 2018.  However, Hewes disputes when Pushard was first formally associated with the Healy Defendants and asserts that Pushard began as

the Healy Defendants' "intern, agent, employee or representative" in 2015.  ECF No. 171 at 5, ¶ 18.  Hewes and the Healy Defendants also dispute whether Pushard worked directly with students, including Hewes, while he was job shadowing. Relevant to those disputes, Hewes alleges that Healy permitted Pushard to wrap her ankle once in a training room during a basketball game in her freshman basketball season on an unspecified date in the winter of 2015.  Hewes also alleges that Pushard had no certification at that time, and that Healy and Cross were both present in the room when Pushard wrapped her ankle.  Hewes does not recall Pushard doing anything inappropriate when he taped her ankle in 2015.[5]  Hewes never saw Pushard perform physical training duties on any other students at Brewer High School prior to becoming certified as an athletic trainer.

Healy Chiropractic hired Pushard as an athletic trainer on August 15, 2018, after entering into an athletic training services agreement with the Brewer School Department for the three school years spanning 2018 to 2021.  The 2018-2021 agreement states: "TEAM DOCTOR/ATHLETIC TRAINER and its employees who provide services to students shall pass required fingerprinting and backgrounds checks conducted by the Maine Department of Education and the SCHOOL.  A copy of the DOE certification (CHRC) card shall be submitted to the Superintendent's Office."  ECF No. 164 at 4, ¶ 20 (quoting ECF No. 156-17 at 14).  After hiring Pushard, Healy sent him to the Brewer Superintendent's office to get his credentials.  Pushard

---

[5]  Hewes denies this assertion without genuinely disputing it.  *See* ECF No. 171 at 8, ¶ 47 (denying on the basis of Hewes's statement: "I don't recall my ankle that specific day.  I had other things going on." (quoting ECF No. 156-2 at 77:6-7)).

was given keys and an access card that allowed him to enter school buildings. Healy assumed the Brewer School Department would run a background check on Pushard.

Pushard was laid off by Healy Chiropractic on March 23, 2020, due to COVID; he resumed his position with Healy Chiropractic on April 27, 2020. On April 15, 2021, Healy received a phone call from the Brewer School Department's superintendent, who told Healy about certain allegations against Pushard. Healy then went to the field where Pushard was working and told him that he needed to leave immediately and that Pushard could no longer cover the Brewer School Department's athletic events. Pushard was placed on administrative leave that same day and remained on leave until Healy Chiropractic fired him on May 12, 2021.

Healy did not know about the sexual contact between Hewes and Pushard at any time before April 15, 2021. By the time Pushard became employed as an athletic trainer for Healy Chiropractic in August 2018, physical contact between him and Hewes had been completely over for approximately one year. There is no record evidence that Healy knew about the sexual contact when he hired Pushard or, for that matter, that Healy ever knew Pushard was likely to have inappropriate contact with a student. Both Healy and Cross were unaware of any rumors that Pushard was having sexual contact with a student. Likewise, neither Healy nor Cross had heard rumors that Hewes was having sexual contact with an older man while she was a Brewer High School student, including from Defendant Samantha Pangburn. Healy and Cross never saw Pushard interact with Hewes or any student in a sexual or inappropriate manner. Hewes did not tell Healy or any employee of Healy Chiropractic about her sexual contact with Pushard. Cross only became aware of the

allegations that Pushard had sexual contact with Hewes when these proceedings began.

At some point, the Healy Defendants received a copy of the Brewer School Department Handbook and were provided periodic training sessions directly through the school.  The Handbook provides that "[a]n individual performing a service for Brewer School Department must be employed by Brewer School Department . . . unless (1) the individual is employed by another organization . . . or (2) the individual is a bona fide independent contractor."  ECF No. 172 at 3, ¶ 17 (quoting ECF No. 156-23 at 49).  At no point was Pushard ever an employee of the Brewer School Department.

### C.   The School Defendants

Defendant Brewer School Department is a Maine school district in Brewer, Maine.  Brewer High School is a school within the Brewer School Department for students in grades nine through twelve.  Defendant Samantha Pangburn first started working at Brewer High School in June 2016 and served in the role of assistant principal for three years.  Hewes disputes Pangburn's role at Brewer High School, asserting instead that Pangburn "became the principal and vice principal both combined" during Hewes's sophomore year.  ECF No. 182 at 1, ¶ 6 (quoting ECF No. 156-2 at 156:16-17).  Only the school principal, superintendent, and athletic director at Brewer School Department have the authority to discipline volunteer coaches.  An assistant principal does not have this authority.

Several documents govern the Brewer School Department's response to complaints of sexual assault and harassment.  Among them is the Brewer School

Department's Affirmative Action Plan (ECF No. 156-7 at 27-52), under which "[s]chool staff is expected to report possible incidents of discrimination or harassment of students to the building principal." ECF No. 156-7 at 42. The Affirmative Action Plan provides further that "[t]he Principal and/or Assistant Principal shall respect the confidentiality of the complainant and the individual(s) against whom the complaint is filed to the extent possible, consistent with the school unit's legal obligations, including the necessity to investigate allegations of discrimination and/or harassment, to take appropriate disciplinary action, and to ensure the safety of the school community." ECF No. 156-7 at 43. The Brewer School Department Employee Handbook (ECF No. 156-23 at 4-222)[6] also provides relevant guidance. The Handbook requires "[a]ny supervisor or manager," such as Pangburn, "who becomes aware of possible sexual or other unlawful harassment [to] immediately advise the affirmative action officer and superintendent so [the possible harassment] can be investigated in a timely and confidential manner." ECF No. 156-23 at 30, 61, 92, 124, 187, 219.

In April 2017, during Hewes's sophomore year at Brewer High School, a classmate told Hewes that she should "go f*** [her] 22-year-old boyfriend." Hewes assumed that her classmate was referring to Pushard; she immediately texted Pushard about what happened and told him she was going to talk to Pangburn.

---

[6] The portion of the summary judgment record cited here includes six versions of the Brewer School Department Employee handbook, effective November 1, 2013 (ECF No. 156-23 at 163-190) and as updated in August 2016 (ECF No. 156-23 at 191-222), August 2017 (ECF No. 156-23 at 4-35), August 2019 (ECF No. 156-23 at 36-66), August 2021 (ECF No. 156-23 at 67-97), and August 2022 (ECF No. 156-23 at 98-128). All six versions of the policy include identical language about the reporting requirements of school supervisors or managers who become aware of possible sexual or unlawful harassment. *See* ECF No. 156-23 at 30, 61, 92, 124, 187, 219.

Pushard told Hewes she needed to go to Pangburn and shut the rumors down immediately because he could get in a lot of trouble.

When Hewes met with Pangburn in April 2017 and told Pangburn about her classmate's comment, Hewes insisted that she did not have a boyfriend and that the comment was not true. Hewes also told Pangburn that she liked a friend of the classmate who had made the comment. Pangburn believed that Hewes was being truthful, in part because Hewes said she did not want the person she purportedly liked (her provocative classmate's friend) to think she had a boyfriend. Hewes asked Pangburn whether she had heard about "the rumor"; Pangburn explained that she had not. ECF No. 166 at 4, ¶ 25. Pangburn did not, in fact, know of any rumors about Hewes and Pushard.[7] Pangburn encouraged Hewes to alert her if there were any other problems; Hewes never mentioned the incident again and Pangburn never heard about the issue again. Pangburn did not find it unusual when Hewes came to her office upset about a classmate's comment because Hewes had previously been upset about interactions with her peers.

After the meeting, Pangburn followed up with the student who had made the offensive comment to Hewes. The student did not share anything specific with Pangburn but explained that he and Hewes butted heads sometimes and that he made the comment out of frustration because Hewes had been annoying.[8] Pangburn

---

[7] Hewes denies this assertion on the basis that a minor cannot consent to enter a sexual relationship with an adult. Because Hewes's denial does not genuinely dispute the substance of the asserted fact, the fact is not properly controverted and, therefore, deemed admitted. D. Me. Local R. 56(f).

[8] Hewes denies this statement on the basis that many people, both adults and students, were aware of rumors. Because Hewes's denial does not genuinely dispute the substance of the asserted fact, the fact is not properly controverted and, therefore, deemed admitted. D. Me. Local R. 56(f).

then followed up with a teacher who, apparently, was present during the incident; the teacher said he had seen that Hewes was upset but did not know what happened.[9] Pangburn did not alert the Brewer School Department affirmative action officer or the superintendent about her conversation with Hewes.

Several years later, in January 2020, Brewer School Department Superintendent Gregg Palmer was investigating a complaint, unrelated to these proceedings, that Hewes may have been groomed or harassed by a person then-employed by the Department. Palmer interviewed Pangburn as part of that investigation. Among the notes Palmer took during his interview with Pangburn was a reminder to "Check on Ben Pushard issue," which Palmer did not specifically recall writing when asked about his notes at a February 2023 deposition. Over a year later, in the spring of 2021, the Brewer School Department Athletic Director asked Hewes's friend about the status of her relationship with the Brewer School Department employee accused of grooming and harassing her.

## II.  LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "'An issue is "genuine" if it can "be resolved in favor of either party," and a fact is "material" if it "has the potential of affecting the outcome of the case."'"  *Feliciano-Muñoz v. Rebarber-Ocasio*, 970 F.3d 53, 62 (1st Cir.

---

[9] Hewes denies this statement on the basis that a minor cannot consent to enter a sexual relationship with an adult.  Because Hewes's denial does not genuinely dispute the substance of the asserted fact, the fact is not properly controverted and, therefore, deemed admitted.  D. Me. Local R. 56(f).

2020) (quoting *Tang v. Citizens Bank, N.A.*, 821 F.3d 206, 215 (1st Cir. 2016)).  A defendant moving for summary judgment can prevail by either "affirmatively produc[ing] evidence that negates an essential element of the non-moving party's claim," or "demonstrat[ing] that the non-moving party will be unable to carry its burden of persuasion at trial" based on the record evidence.  *Ocasio-Hernández v. Fortuño-Burset*, 777 F.3d 1, 4-5 (1st Cir. 2015) (quoting *Carmona v. Toledo*, 215 F.3d 124, 132 (1st Cir. 2000)).

"[A]s to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party."  *McCrory v. Spigel (In re Spigel)*, 260 F.3d 27, 31 (1st Cir. 2001) (quoting *Century 21 Balfour Real Est. v. Menna (In re Menna)*, 16 F.3d 7, 9 (1st Cir. 1994)).  It follows that, to withstand summary judgment, the nonmovant must provide "'enough competent evidence' to enable a factfinder to decide in its favor on the disputed claims."  *Carroll v. Xerox Corp.*, 294 F.3d 231, 237 (1st Cir. 2002) (quoting *Goldman v. First Nat'l Bank of Bos.*, 985 F.2d 1113, 1116 (1st Cir. 1993)).

In deciding summary judgment motions, the Court construes the record and all reasonable inferences therefrom in the light most favorable to the nonmovant.  *Braga v. Genlyte Grp., Inc.*, 420 F.3d 35, 38 (1st Cir. 2005).  That approach does not, however, require the court "to draw unreasonable inferences or credit bald assertions [or] empty conclusions."  *Theriault v. Genesis HealthCare LLC*, 890 F.3d 342, 348 (1st Cir. 2018) (alteration in original) (quoting *Cabán Hernández v. Philip Morris USA, Inc.*, 486 F.3d 1, 8 (1st Cir. 2007)); *cf. Johnson v. Johnson*, 23 F.4th 136, 141 (1st Cir.

2022) ("The nonmovant cannot rely on "conclusory allegations, improbable inferences, and unsupported speculation"" to stave off summary judgment. (quoting *Brader v. Biogen Inc.*, 983 F.3d 39, 53 (1st Cir. 2020))).

When multiple parties move for summary judgment simultaneously, the "court must consider each motion separately, drawing inferences against each movant in turn." *Blackie v. Maine*, 75 F.3d 716, 721 (1st Cir. 1996) (quoting *EEOC v. Steamship Clerks Union, Loc. 1066*, 48 F.3d 594, 603 n.8 (1st Cir. 1995). I first address the Healy Defendants' Motion for Summary Judgment and then turn to the School Defendants' Motion for Summary Judgment.

## III.  HEALY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The claims that survived the Healy Defendants' Motion to Dismiss (ECF No. 31) come in three varieties: (1) federal constitutional claims actionable under 42 U.S.C.A. § 1983 (West 2024) (Counts I-III); (2) a Maine state constitutional claim (Count XV); and common law tort claims (Counts IV-VI, XI-XIII, XVII).

### A.    Section 1983 Claims and Maine Constitutional Claim

**Table 1.   Non-Tort Claims Against Healy Defendants**

| Count | Claim |
|-------|-------|
| I | Section 1983 – State-Created Danger |
| II | Section 1983 – Due Process Violation |
| III | Section 1983 – Equal Protection Violation |
| XV | Maine Constitution – Violation of Article I, § 6-A |

The Healy Defendants argue that they are entitled to summary judgment on Hewes's claims under section 1983 and Article I, § 6-A of the Maine State

Constitution, because they are not state actors but rather independent contractors who provided services to the Brewer School Department.[10]   Hewes disagrees, contending that the Healy Defendants are state actors because they "perform[] a governmental function under the Agreement/Contract with the Brewer School Department." ECF No. 170 at 10.  For the reasons that follow, I agree with the Healy Defendants and grant summary judgment in their favor on Counts I, II, III, and XV.

"Section 1983 'affords a private right of action in favor of persons whose federally assured rights are abridged by state actors.'" *Parker v. Landry*, 935 F.3d 9, 14 (1st Cir. 2019) (quoting *Kando v. R.I. State Bd. of Elections*, 880 F.3d 53, 58 (1st Cir. 2018)).   Likewise, Article I, § 6-A of Maine's Constitution only protects individuals against constitutional violations committed by state actors.  *See, e.g.*, *Onat v. Penobscot Bay Med. Ctr.*, 574 A.2d 872, 875 (Me. 1990) (affirming grant of summary judgment on due process and equal protection claims under the Maine Constitution where record lacked facts to show that defendant hospital and its employees were state actors); *see also State v. Rees*, 2000 ME 55, ¶ 39, 748 A.2d 976 (Saufley, J., dissenting) ("[A]lthough article I, section 6-A does not expressly require state action, we have made it clear that . . . state action nevertheless is a necessary element of a due process claim regardless of the context in which it might arise."

---

[10]  Count XV of the Amended Complaint invokes both the Due Process and Equal Protection clauses of Article I, § 6-A of the Maine State Constitution.  In moving for summary judgment on Count XV, the Healy Defendants contend that they are entitled to judgment as a matter of law on the alleged due process violation because they are not state actors but make no argument addressing the alleged equal protection violation.  "Because there was no state action involved" in the Healy Defendants' alleged misconduct, I do not consider Hewes's "contentions that the defendants actions deprived [her] of due process and equal protection under the . . . state Constitution[]." *Onat v. Penobscot Bay Med. Ctr.*, 574 A.2d 872, 876 (Me. 1990).

(citing *Onat*, 574 A.2d at 875) (other citations omitted)).  Thus, when bringing claims under both section 1983 and the Maine Constitution, a plaintiff must allege facts establishing that the challenged conduct "transpired under color of state law." *Santiago v. Puerto Rico*, 655 F.3d 61, 68 (1st Cir. 2011); *see also Holland v. Sebunya*, 2000 ME 160, ¶¶ 10-15 & n.7, 759 A.2d 205 (applying section 1983's color-of-law requirement to state constitutional claims).

The First Circuit has identified three circumstances under which a private party may be deemed a state actor: (1) where the private party "assumes a traditional public function when performing the challenged conduct" (the public-function test); (2) "if the challenged conduct is coerced or significantly encouraged by the state" (the state-compulsion test); or (3) "if the state has 'so far insinuated itself into a position of interdependence with the [private party] that it was a joint participant in [the challenged activity]'" (the nexus/joint action test).  *Santiago*, 655 F.3d at 68 (alterations in original) (quoting *Estades-Negroni v. CPC Hosp. San Juan Capestrano*, 412 F.3d 1, 5 (1st Cir. 2005)).  Hewes's posits that the Healy Defendants are state actors under the public function test only.  "Under the public function test, state action inheres 'in the exercise by a private entity of powers traditionally *exclusively* reserved to the State.'"  *Id.* at 69 (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 352 (1974)).  "The public function test has a specific, targeted purpose: it is meant to counteract a state's efforts to evade responsibility by delegating core functions to private parties."  *Id.*

The Healy Defendants are entitled to summary judgment on Hewes's section 1983 claims and Maine constitutional claim because the undisputed facts do not

support finding that the Healy Defendants were state actors. Hewes argues only that the Healy Defendants are state actors under the public-function test by virtue of the activities they performed under their contracts with the Brewer School Department. Hewes's conclusory argument, however, fails to establish that those activities amounted to an "exercise . . . of powers traditionally *exclusively* reserved to the State." *Santiago*, 644 F.3d at 69. The mere fact that the Healy Defendants "entered into a contract with the [State] does not alter their status" from private parties to state actors. *Id.* at 68. Nothing else in the stipulated summary judgment record expressly establishes that the Healy Defendants exercised powers reserved exclusively for the State or supports a reasonable inference of the same. Accordingly, Hewes fails to meet her burden as to her section 1983 claims and Maine constitutional claim, and the Healy Defendants are entitled to summary judgment on those claims.

**B.    Tort Claims**

**Table 2.    Tort Claims Against Healy Defendants**

| Count | Claim |
|---|---|
| IV | Assault and Battery |
| V | Negligence – General |
| VI | Negligence – Respondeat Superior/Agency |
| XI | Negligent Hiring, Training, Supervision, and Retention |
| XII | Negligent Infliction of Emotional Distress |
| XIII | Intentional Infliction of Emotional Distress |
| XVII | Invasion of Privacy |

The Healy Defendants argue that they are entitled to summary judgment on Hewes's tort claims because: (1) they did not employ Benjamin Pushard at any time during the period when Pushard had sexual contact with Hewes; and (2) they are not vicariously liable for Pushard's conduct because sexual abuse and/or assault were not within the scope of his employment as an athletic trainer.  Additionally, as to Hewes's tort claims alleging negligence (Counts V, VI, XI, and XII), the Healy Defendants contend that summary judgment is warranted because they did not owe a duty of care to protect Hewes from Pushard, a third party.  The Healy Defendants argue further that even if they had such a duty, there is no evidence in the summary judgment record to support concluding that they knew or should have known about the need to control Pushard's conduct or that any of the unlawful sexual contact between Pushard and Hewes occurred on premises that the Healy Defendants owned or controlled.

In response, Hewes argues that Pushard "acted as [the Healy Defendants'] trainee, agent, representative[,] and employee" beginning in 2015, such that they had supervisory responsibility over Pushard during the period when he sexually assaulted Hewes and are, therefore, vicariously liable for his misconduct.  ECF No. 170 at 8.  The essence of Hewes's argument is that the Healy Defendants had "special duties" to protect her from third parties that are self-evident from their contracts with the Brewer School Department.  ECF No. 170 at 7.  Hewes also implies that the Healy Defendants owed her a special duty of care by virtue of their custodial relationship with her.[11]  Hewes contends that the Healy Defendants breached their

_____

[11] Hewes argues further that the Healy Defendants owed her a duty of care under the "Maine Code of Rules Board of Chiropractic Licensure, 02-297, Chapter 7, (C)(1)."  ECF No. 170 at 19.  Although

special duty to protect her from third parties by allowing Pushard to have contact with her without adequate practices related to hiring, training, and supervision.

"[I]n instances of nonfeasance rather than misfeasance, and absent a special relationship, the law imposes no duty to act affirmatively to protect someone from danger unless the dangerous situation was created by the defendant.  Only when there is a 'special relationship,' may the actor be found to have a common law duty to prevent harm to another, caused by a third party." *Belyea v. Shiretown Motor Inn, LP*, 2010 ME 75, ¶ 9, 2 A.3d 276 (alteration in original) (quoting *Bryan R. v. Watchtower Bible & Tract Soc'y of N.Y., Inc.*, 1999 ME 144, ¶ 14, 738 A.2d 839); *see also Fortin v. Roman Cath. Bishop of Portland*, 2005 ME 57, ¶ 25, 871 A.2d 1208 (acknowledging the "special relationship" exception to the "general rule . . . that an

---

that citation does not correspond with a precise section of the referenced regulation, that regulation provides, in pertinent part:

> Incompetence in the practice of chiropractic includes, but is not limited to:
>
> 1.  intentionally or recklessly causing physical or emotional harm to a client or patient;
>
> 2.  failing to maintain the confidentiality of client or patient information, except as otherwise required by law;
>
> . . .
>
> 6.  failing to provide adequate supervision of an assistant;
>
> . . . .
>
> 12.  failure to report incidents of child or adult abuse or neglect as mandated by state law[.]

02-297 C.M.R. ch. 7, § 3(C)(1), (2), (6), (12); *see also* 02-297 C.M.R. ch. 7, § 2(E) (authorizing the Board of Chiropractic Licensure to "take disciplinary action authorized by statute based upon . . . [i]ncompetence or misconduct in the practice of chiropractic."). The Court has not found any authority to support the conclusion, implied by Hewes, that an allegation of misconduct subject to possible disciplinary action by an entity charged with enforcing professional standards can establish a special duty between the actor alleged to have committed the misconduct and the alleged victim of that misconduct.

actor has no duty to protect others from harm caused by third parties."). Whether a special relationship exists is generally a case-by-case determination "unless the nature of a given relationship is such that there is always certain to be a great disparity of position and influence." *Dragomir v. Spring Harbor Hosp.*, 2009 ME 51, ¶ 19, 970 A.2d 310. Section 317 of the Second Restatement of Torts, which Maine has adopted, provides:

> A master is under a duty to exercise reasonable care so to control his servant while acting outside the scope of his employment as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if
>
> (a) the servant
>
> > (i) is upon the premises in possession of the master or upon which the servant is privileged to enter only as his servant, or
> >
> > (ii) is using a chattel of the master, and
>
> (b) the master
>
> > (i) knows or has reason to know that he has the ability to control his servant, and
> >
> > (ii) knows or should know of the necessity and opportunity for exercising such control.

Restatement (Second) of Torts, § 317 (Am. L. Inst. 1965); *see, e.g.*, *Fortin*, 2005 ME 57, ¶¶ 39, 75, 871 A.2d. 1208 (applying § 317 in deciding a negligent supervision claim). Additionally, a fiduciary relationship can be tantamount to a "special relationship" that creates a duty to protect against third-party harm where there exists "disparate positions of the parties and a reasonable basis for the placement of trust and confidence in the superior party *in the context of specific events at issue*." *Watchtower Bible*, 1999 ME 144, ¶ 20, 738 A.2d 839 (emphasis added); *accord Dragomir*, 2009 ME 51, ¶ 19, 970 A.2d 310. Courts must have "specific facts"

regarding the nature of the relationship alleged to have given rise to a fiduciary duty to determine whether a legal duty may, indeed, exist.  *Watchtower Bible*, 1999 ME 144, ¶ 20, 738 A.2d 839.

The Healy Defendants are entitled to summary judgment on Hewes's negligence-based tort claims because the stipulated record lacks evidence to support the conclusion that the Healy Defendants had a special relationship with Hewes that required them to protect her from third-party harm.  Hewes argues vaguely that the special relationship arises from regulations governing the Board of Chiropractic Licensure, Title IX, and the Healy Defendants' contracts with the Brewer School Department, to which she was allegedly a third-party beneficiary.  Those undeveloped arguments aside, there is no record evidence from which the Court can determine whether a special relationship exists between the Healy Defendants and Hewes.  Specifically, the summary judgment record does not include any evidence showing that the Healy Defendants knew or should have known that Benjamin Pushard was engaged in inappropriate sexual contact with Hewes or had a proclivity for or history of similar misconduct.  Hewes concedes that the Healy Defendants had no such actual knowledge and strains to argue that they should have asked school officials about rumors of inappropriate sexual contact without identifying evidence that the Healy Defendants actually knew about those unverified accounts of Pushard's involvement with her.  Relatedly, Hewes (1) does not genuinely dispute that Pushard's sexual misconduct did not occur on premises that the Healy Defendants owned or controlled; and (2) does not assert that Pushard's conduct toward her in 2015 in a training room he accessed as the Healy Defendants' trainee,

intern, agent, representative, or employee is the basis for her claims. Considered together with the record and undisputed material facts, Hewes's concessions and theory of liability belie her contention that the Healy Defendants had a special relationship with her such that they owed her a duty of care to protect her from Pushard's misconduct.

Finally, Hewes's theory of vicarious liability for her intentional tort claims (Counts IV, XIII, and XVII) is a non-starter. There is no evidence in the stipulated record that expressly shows or supports the inference that Pushard's sexual contact with Hewes was conduct within the scope of his employment. *See Mahar v. StoneWood Transp.*, 2003 ME 63, ¶¶ 13-15, 823 A.2d 540 (applying Restatement (Second) of Agency to define the scope of employment in analyzing a tort claim premised on vicarious liability); *see also* Restatement (Second) of Agency, § 228 (Am. L. Inst. 1958) (defining criteria for determining whether "[c]onduct of a servant" falls within the scope of their employment).

In sum, the Healy Defendants are entitled to summary judgment on all remaining claims against them.

## IV.  SCHOOL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

One section 1983 claim remains against Pangburn (Count I) and two Title IX claims remain against Brewer School Department (Counts VII and X) after this Court's Order (ECF No. 63) partially granting the School Defendants' Motions to Dismiss (ECF Nos. 42, 43).

**Table 3.   Claims Against School Defendants**

| Count | Claim | Alleged Against |
|-------|-------|-----------------|
| I | Section 1983 – State-Created Danger | ▪ Samantha Pangburn |
| VII | Title IX – Deliberate Indifference | ▪ Brewer School Department |
| X | Title IX – Retaliation | ▪ Brewer School Department |

## A.   Section 1983 Claim Against Pangburn

Pangburn moves for summary judgment on the only claim remaining against her: a section 1983 claim alleging a substantive due process violation under a state-created-danger theory (Count I).   Pangburn argues that there is no record evidence to support concluding that she affirmatively acted to create or enhance a danger to Hewes or that her conduct shocked the conscience and that, in any event, qualified immunity shields her from liability.   Hewes argues that qualified immunity does not apply to Pangburn under the circumstances and insists that the substantive due process claim against her is viable and supported by the summary judgment record.   For the following reasons, the School Defendants' Motion is granted as to Defendant Pangburn.

### 1.   Pangburn is entitled to qualified immunity.

"Although government officials are subject to suit for federal constitutional or statutory violations under § 1983, they are generally shielded from civil damages liability under the principle of qualified immunity so long as their actions do not 'violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"   *Kelley v. LaForce*, 288 F.3d 1, 6 (1st Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).   Courts engage in a two-part inquiry

to determine if a defendant enjoys qualified immunity, asking: (1) whether the facts, viewed in the light most favorable to the party opposing summary judgment, establish a constitutional violation; and (2) whether the violated right was clearly established at the time the offending conduct occurred. *Hunt v. Massi*, 773 F.3d 361, 367 (1st Cir. 2014). As to the latter, "[t]he relevant, dispositive inquiry . . . is whether it would be clear to a reasonable officer that h[er] conduct was unlawful in the situation [s]he confronted." *Maldonado v. Fontanes*, 568 F.3d 263, 269 (1st Cir. 2009) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam)). "Put simply, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

On this record, Defendant Pangburn is entitled to qualified immunity and, therefore, summary judgment on the substantive due process claim. Even in the light most favorable to Hewes, the summary judgment record cannot be read to support the conclusion that Pushard's limited investigation into the rumor that Hewes had an unnamed 22-year-old boyfriend violated a constitutional right. Hewes brought the rumor to Pangburn's attention and told her it was false. After they discussed the rumor, Pangburn encouraged Hewes to alert her about any other problems and initiated a limited investigation into the rumor, following up with the student who had confronted Hewes about the rumor as well as a teacher (who, the facts suggest, was present during the confrontation). The student told Pangburn that he confronted Hewes about the rumor out of frustration with her; the teacher said he saw that Hewes had been upset but did not know why.

Hewes urges that, under the totality of the circumstances, Pangburn's awareness of the rumor evinces her "actual knowledge of a substantial risk of harm, i.e., continued sexual assaults and exploitation of a minor." ECF No. 181 at 18. I disagree. The most favorable reading of the summary judgment record for the Plaintiff does not require equating a vague, uncorroborated rumor that Hewes denied and never again raised with Pangburn with actual knowledge of (1) sexual contact occurring between Hewes and an adult generally or Pushard specifically,[12] or (2) a substantial risk that such harm would continue. *See, e.g.*, *Wadsworth v. Maine Sch. Admin. Dist. 40*, 663 F. Supp. 3d 83, 128 (D. Me. 2023) ("'rumors' . . . have been held not to constitute 'actual knowledge'" (quoting *Doe v. Bradshaw*, 203 F. Supp. 3d 168, 185 (D. Mass. 2016))); *see also Bradshaw*, 203 F. Supp. 3d at 185 ("Courts have generally interpreted 'actual knowledge' as requiring highly reliable and similar reports of inappropriate teacher behavior.").

Even assuming, *arguendo*, that Pangburn's decision not to investigate further violated Hewes's right to substantive due process under a state-created-danger theory, no such right was clearly established "in the situation [Pangburn] confronted."[13] *Maldonado*, 568 F.3d at 269. A reasonable officer without actual knowledge of the underlying sexual contact between Hewes and Pushard operating under like circumstances might view Pangburn's decision not to investigate further—

---

[12] The summary judgment record does not establish or support the inference that Pangburn either knew or suspected that Benjamin Pushard was Hewes's rumored 22-year-old boyfriend.

[13] Hewes makes no argument at summary judgment that Pangburn's failure to investigate violated a clearly established right and offers no authority to support that conclusion. In a similar vein, Hewes's response to the School Defendants' motion does not confront the clearly-established-right question at all and instead raises a conclusory argument that ignores the framework, established by caselaw, for assessing qualified immunity.

for example, by reporting the rumor to school administrators—as *imprudent*. But the summary judgment record does not compel the conclusion that a reasonable officer would view Pangburn's limited inquiry under the circumstances as *unlawful—i.e.*, as violating Hewes's substantive due process rights. Accordingly, I grant summary judgment on the section 1983 claim against Pangburn because she is immune from liability.

### 2. Pangburn would be entitled to summary judgment even if she were not immune from liability.

Even if Pangburn was not entitled to qualified immunity, which she is, I would still grant the motion for summary judgment on the substantive due process claim against her. Under the state-created-danger doctrine, the state's failure to protect an individual against private violence can violate due process "where the state action '*affirmatively* places the plaintiff in a position of a danger,' that is, where state action creates or exposes an individual to a danger which he or she would not have otherwise faced." *Johnson v. City of Biddeford*, 665 F. Supp. 3d 82, 102 (D. Me. 2023) (emphasis added) (alteration omitted) (quoting *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061 (9th Cir. 2006)), *aff'd*, 92 F.4th 367 (1st Cir. 2024). To make out a "state-created-danger claim" in the First Circuit, a plaintiff must establish:

(1)  that a state actor or state actors affirmatively acted to create or enhance a danger to the plaintiff;

(2)  that the act or acts created or enhanced a danger specific to the plaintiff and distinct from the danger to the general public;

(3)  that the act or acts caused the plaintiff's harm; and

(4)  that the state actor's conduct, when viewed in total, shocks the conscience.

(i)     Where officials have the opportunity to make unhurried judgments, deliberate indifference may shock the conscience, particularly where the state official performs multiple acts of indifference to a rising risk of acute and severe danger. To show deliberate indifference, the plaintiff must, at a bare minimum, demonstrate that the defendant actually knew of a substantial risk of serious harm and disregarded that risk.

(ii)     Where state actors must act in a matter of seconds or minutes, a higher level of culpability is required.

*Irish v. Fowler*, 979 F.3d 65, 75 (1st Cir. 2020). The first element of a claim under the doctrine requires an affirmative act; an omission does not suffice. *Cf. Cohen v. City of Portland*, No. 2:21-cv-00267-NT, 2022 WL 1406204, at *7 (D. Me. May 4, 2022) (delineating between affirmative acts and omissions in assessing a substantive due process claim premised on a state-created-danger theory).

Immunity aside, Pangburn is entitled to summary judgment on the substantive due process claim because the record does not include any facts from which the Court can conclude, directly or by inference, that she "affirmatively acted to create or enhance a danger" to Hewes. *Irish*, 979 F.3d at 75. Hewes's opposition speaks only to omissions:

- "Pangburn's *inactions* created or enhanced a danger to Plaintiff." ECF No. 181 at 8 (emphasis added).

- "The *inaction* of Samantha Pangburn . . . markedly increased the risk of harm to [Hewes]." ECF No. 181 at 8 (emphasis added).

- Pangburn "*did nothing*, which plainly demonstrates her deliberate indifference to and the school district's liability under Title IX." ECF No. 181 at 8 (emphasis added).

- "Pangburn *did nothing* to determine . . . the truth." ECF No. 181 at 16 (emphasis added).

- "A reasonable jury could find that Pangburn's decision *to not investigate and report* was unreasonable . . . ."  ECF No. 181 at 16 (emphasis added).

The record, however, is not quite so absolute; it shows that Pangburn did something—namely, conducted a limited inquiry into the classmate's comment and, by implication, the underlying rumor that Hewes was having sexual contact with an adult.  Hewes seeks to hold Pangburn liable for not conducting a more searching investigation and/or reporting the rumor to the Brewer School Department's affirmative action officer and/or superintendent.  Although Pangburn's limited action may have been unwise or, perhaps, actionable under other legal theories, her decision not to investigate further is not an affirmative act that created or enhanced a risk of danger to Plaintiff—an essential element of Hewes's substantive due process claim.  Absent evidence of an affirmative act to anchor Hewes's state-created-danger theory, Pangburn is entitled to summary judgment on the section 1983 claim.

## B.   Title IX Claims against Defendant Brewer School Department

### 1.   Title IX – Deliberate Indifference

On Hewes's first surviving claim under Title IX, premised on a Title IX hostile-environment-harassment theory (Count VII), the parties focus their arguments exclusively on whether the record supports concluding that Pangburn or others acted with deliberate indifference.  The Brewer School Department argues that it is entitled to summary judgment because the record does not show either that Pangburn or any "appropriate person" had actual knowledge of sexual harassment. Hewes insists that they did.

Under a Title IX claim premised on a hostile-environment-harassment theory, a federal funding recipient "can be liable for a claim of student-on-student and teacher-to-student harassment.  To prevail on such claim, a student must show that they were (1) 'subjected to harassment[;]' (2) on the basis of sex; (3) 'that the harassment was sufficiently severe and pervasive to create an abusive educational environment;' and (4) 'that a school official authorized to take corrective action . . . exhibited deliberate indifference to' the harassment." *Grace v. Bd. of Trs., Brooke E. Bos.*, 85 F.4th 1, 10-11 (1st Cir. 2023) (citation omitted) (quoting *Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 66 (1st Cir. 2002)).  Establishing deliberate indifference under the fourth prong of that test involves a two-part showing.  First, the funding recipient must have had actual knowledge of the harassment, which "requirement demands that the official who is informed of the harassment be an 'appropriate person'"—*i.e.*, "an official of the recipient entity with authority to take corrective action to end the harassment." *Id.* at 11.  "Second, the official's 'response [to the harassment] must amount to deliberate indifference to discrimination.'" *Id.* (alteration in original) (quoting *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998)).  "A school might be deliberately indifferent to harassment where it had notice of the harassment and 'either did nothing or failed to take additional reasonable measures after it learned that its initial remedies were ineffective.'" *Id.* (quoting *Porto v. Town of Tewksbury*, 488 F.3d 67, 74 (1st Cir. 2007)).  Deliberate indifference determinations are often fact-based and context-specific. *Id.*

The Brewer School Department is entitled to summary judgment on this claim because there are no facts in the stipulated record showing that Pangburn or any

"appropriate person" had actual knowledge of the sexual assaults and harassment that Hewes endured.  As discussed in the context of the section 1983 claim brought against Defendant Pangburn, the summary judgment record reflects only that Pangburn was aware of a rumor in April 2017 that Hewes was having sexual contact with an adult man, which is not tantamount to actual knowledge of the same.[14]  *See supra* Part IV.A.1.  Therefore, even if Pangburn was an "appropriate person" with authority to discipline Pushard—a conclusion that, on this record, is implausible given ambiguity over Pangburn's precise role, and more crucially, the lack of evidence establishing that Pushard was associated with the Brewer School Department and/or the Healy Defendants as a volunteer and/or employee in 2017——her lack of actual knowledge is the death knell to Hewes's Title IX claim arising from her conduct.  Hewes does not specify any "appropriate person" aside from Pangburn in advancing her deliberate-indifference claim, so that claim must fail.

### 2.  Title IX – Retaliation

Likewise, the Brewer School Department is entitled to summary judgment on Hewes's other surviving Title IX claim, for retaliation (Count X).  The Brewer School Department moves for summary judgment on this claim, arguing that (1) Hewes was not a student within the school district when the alleged retaliation occurred and,

---

[14]  Hewes limits the basis for this claim to the "serious and ongoing sexual assaults and harassment . . . by Defendants."  ECF No. 4 at 42, ¶ 225.  Even in the light most favorable to Hewes, I do not read the Amended Complaint as alleging a claim of student-on-student harassment arising from the actions of Hewes's classmates, namely the classmate who confronted Hewes about rumors of her sexual involvement with an adult.  *See* ECF No. 63 at 19-20 (concluding that Hewes adequately pleaded a Title IX retaliation claim arising from an incident in which the Brewer School Department's Athletic Director questioned Hewes's friend in 2021 (after Hewes graduated from High School) about events unrelated to this proceeding).

therefore, lacks standing to bring a retaliation claim; and (2) Hewes did not suffer an adverse action. Hewes does not dispute that she was not a student within the Brewer School Department when the alleged retaliation occurred. Rather, she responds that "Title IX regulations expressly address the issue of retaliation, even after graduation, because they provide a broad temporal scope of protection based on Plaintiff's rights, not the timing of when a Plaintiff exercises her rights." ECF No. 181 at 21. Hewes does not offer any argument to substantiate the adverse action she suffered for reporting that she was sexually harassed. However, the Amended Complaint and summary judgment record indicate that the Brewer School Department Athletic Director committed the alleged retaliation when he asked Hewes's friend, a school employee, about Hewes's relationship status with a person then-employed by the Brewer School Department. That questioning occurred in the spring of 2021, after Hewes had graduated from Brewer High School.

A claim for retaliation under Title IX consists of four elements: (1) that the plaintiff "engaged in activity protected by Title IX"; (2) "that the alleged retaliator knew of the protected activity"; (3) "that the alleged retaliator subsequently undertook some action disadvantageous to the actor"; and (4) "that a retaliatory motive played a substantial part in prompting the adverse action." *Frazier*, 276 F.3d 52 at 67. Setting aside the parties' arguments about standing, there is no record evidence establishing that the alleged retaliator, the Brewer School Department Athletic Director, knew that Hewes had reported sexual harassment or that he had a retaliatory motive for taking adverse action against her. Therefore, assuming

without deciding that Hewes has standing to bring the Title IX retaliation claim, the Brewer School District is entitled to summary judgment.

## V.  CONCLUSION

For the foregoing reasons, the Healy Defendants' Motion for Summary Judgment (ECF No. 163) and the School Defendants' Motion for Summary Judgment (ECF No. 165) are **GRANTED**.

**SO ORDERED.**


**Dated this 5th day of May, 2024.**

**/s/ Jon D. Levy**
**U.S. DISTRICT JUDGE**
